No. 3040

Opinion construing Section 7 of H.B. No. 133, and holding:

It is our opinion that Section 7 of H.B. No. 133 author-
izes the State Superintendent to take into consideration
the presence of University lands and National forests
within a School District as one of the factors in de-
termining the need of that district, but that such dis-
trict must meet all the requirements set out in other
sections of the Act in order to qualify for state aid.

---

OFFICE OF THE ATTORNEY GENERAL

March 3, 1939

Honorable H. A. Forman
County Attorney, Upton County
Rankin, Texas

Honorable Fowler Roberts
County Attorney, Reagan County
Big Lake, Texas

Gentlemen:

Opinion No. 0-334
Re: Ruling on the interpretation
of House Bill No. 133, Chap-
ter 60, Acts 1937, Forty-fifth
Legislature, Second Called Ses-
sion

We have received from each of you a request for a ruling
on the interpretation of House Bill No. 133, Chapter 60, Acts, 1937
Forty-fifth Legislature, Second Called Session, and particularly
Section 7, thereof, as it affects the right of a school district
containing University lands to receive State aid under said Act,
regardless of need. Inasmuch as both requests involve the same
question, we shall answer them in one opinion.

We wish to express our appreciation for the help given
us by the briefs on this question submitted by Mr. Fowler Roberts
and Mr. Roy R. Priest.

House Bill No. 133, above referred to, is entitled "Amend-
ing Rural Aid and Equalization Fund Law", and was passed by the Sec-
ond Called Session of the Forty-fifth Legislature in October, 1937.
It constitutes a re-enactment, with some changes and additions, of
all except the appropriation section of the Act passed five months
earlier by the same Legislature at its regular session. The earlier
Act is Senate Bill No. 185, Chapter 474, Acts Forty-fifth Legisla-
ture, Regular Session, entitled "Rural Aid and Equalization Fund
Appropriation."

Section 7 of House Bill No. 133 reads as follows:

"Provided the State Superintendent shall take into consideration, in fixing allowances to school districts, any loss sustained by said district by reason of the Federal Government buying land for National forests, and by reason of the location in said districts of University lands, and the State Superintendent shall be authorized to make allocations to said districts by virtue of losses sustained by said district by reason of Federal purchase of lands, the amounts to be fixed by the State Superintendent based upon existing facts and circumstances applicable to all other school districts, and in all exceptions provided herein the consent of the State Board of Education shall be first had and obtained."

This section is identical to the one contained in the prior Act with the exception that the later enactment added the last clause, "and in all exceptions provided herein the consent of the State Board of Education shall be first had and obtained."

H.B. No. 133 is the most recent enactment of a long series of biennial appropriations providing aid to rural schools. The first of these dates back to 1915. Each succeeding Rural Aid Law has sought to carry out the general purposes of its predecessor, with certain changes in the provisions for the distribution and administration of the fund. Judge Cureton in Mumme vs. Marrs, 40 S.W. (2d) 31, traces the history of these laws and states that their general purpose is to try to equalize educational opportunities throughout the state. He says at page 37 of said opinion:

"That rural aid appropriations have a real relationship to the subject of equalizing educational opportunities in the state, and tend to make our system more efficient, there can be no doubt. It is true that not all schools will be aided, since many, because of large scholastic population and local wealth against which taxes have been levied, may not need the aid, and are, therefore, not within the purposes of the Act."

Judge Cureton was discussing the Rural Aid Act passed in 1929, being Chapter 14, General Laws of the Third Called Session of the Forty-First Legislature, one of the lineal ancestors of the Act here under consideration.

"The cardinal principle of statutory constructions is to ascertain the legislative intent from the statute." Cousins vs. Sovereign Camp. W.O.W., Special Supreme Court of Texas, 1931, 35 S.W. 696. This should be determined by looking to the entire statute, Moorman vs. Terrell, Tex. S. Ct. 1918, 202 S.W. 727, Greenwood, J., at p. 728: "We cannot adopt a construction of Section 17, no matter how plainly required by its language, standing alone, which would defeat the intent of the Legislature, in the enactment of this Act."

Turning to an analysis of this Act as a whole, we find indications that the purpose of the Legislature, as evidenced by a reading of the entire Act, was to equalize educational opportunity throughout the State by supplementing the income of those schools which, because of inadequate financial resources, were unable to maintain the minimum educational standards prescribed in the Act. Need of financial assistance is recited many times as a prerequisite to eligibility for state aid funds.

Section 1 of the prior act passed by the Legislature in May, 1937 (which section was not amended by H.B. No. 133), states that the Act is "For the purpose of promoting public school interest and equal-

izing the educational opportunities afforded by the state to all children of scholastic age within the State * * *."

In Section 14 of H.B. No. 133, it is provided:

"*** and no aid shall be given unless it can be shown that all provisions of this Act have been complied with, and that such amount of aid is actually needed."

In Section 15, it is recited:

"* * *provided that if the school has sufficient State and County available funds to maintain the school for an eight (8) months term according to the salary schedule adopted by the State Board of Education or with its local maintenance tax, to maintain the desired length of term, not to exceed nine (9) months, as provided in Section 2, it shall not be eligible to receive aid; * * *'

"Provided, also, that all aid granted out of funds herein provided shall be allotted only on the basis of need, based upon a proper budgeting of each district asking for any form of aid."

In Section 16, it is provided:

"All aid granted out of funds provided shall be allotted only on the basis of need based upon an approved budget of each district asking for any form of aid, except as otherwise provided in this Act."

Again in Section 22 appears a similar provision:

"* * * and all aid shall be granted on the basis of need after proper budgeting, the same as herein provided."

Section 23 relates in part to the qualification of incorporated cities, towns and villages for aid, and after setting out certain requirements, concludes:

"* * *and whose salary budget shows a need therefor * * *"

Finally, the emergency clause of the Act commences:

"The fact that many schools are in need of additional aid * * *".

As further evidence that the underlying principle of the entire Act is to grant aid only to those schools in actual need thereof, we find several provisions which disqualify a school by reason of circumstances which tend to indicate that State aid is not essential.

In Section 6, it is provided that:

"Any school district which shall after October 1, 1937, reduce its existing property assessment and/or existing tax rates, thereby enabling it to participate under this Act, shall not be eligible to receive aid from any of the funds herein provided* * *".

In Section 9, it is stated:

"Should any school district eligible to receive aid under the provisions of this Act maintain a salary schedule in excess of the salary schedule as determined by the State Superintendent with the approval of the State Board of Education, the amount of aid received by such school district shall be reduced by the amount of such excess."

And in Section 12 it is provided that;

"Should any school which would otherwise be eligible to receive aid agree, provide or contract with teachers to pay a smaller monthly salary during the remainder of the terms following the granting of aid provided out of local funds, than is paid out of State funds, then such school shall forfeit its rights to receive aid."

We have quoted the foregoing excerpts from the Act at such length because they indicate the expressed and oft-repeated intention of the Legislature throughout the entire Act to limit the expenditures of the $5,500,000.00 therein appropriated to those school districts, which by reason of insufficient resources are unable to maintain the minimum educational facilities prescribed in the Act. H.B. No. 133 is entitled: "Amending Rural Aid and Equalization Fund Law." A careful study of the law, and the many similar laws preceding it will show that by "equalization" is meant equalization of educational opportunity for the school children throughout Texas, and not equalization of the tax burden. There is no word either in the caption or the body of H. B. No. 133 to justify the latter interpretation.

In the light of the foregoing analysis of the Act as a whole, what is the fair construction of Section 7?

By that section the State Superintendent is directed to "take into consideration, in fixing allowances to school districts, any loss sustained by said district by reason of the Federal Government buying lands for National forests, and by reason of the location of said districts of University lands." Other sections of the Act establish certain criteria by which the State Superintendent shall be guided in the exercise of his discretion in making allotments of the appropriation. We believe this Section provides another such criteria, i.e. that the location of National forests or University lands within a school district shall be one of the factors to be taken into consideration by the State Superintendent in the proration of the $5,500,000.00 appropriation among the school districts of the State to the end that educational opportunity shall be more nearly equalized. Section 7 continues:

"* * * and the State Superintendent shall be autho-ized (underscoring ours) to make allocations to said districts by virtue of losses sustained by said district by reason of Federal purchase of land * * *".

The language is not mandatory, It does not say that "he shall make allocations to said districts in the amount of losses sustained." It merely authorizes him to take these factors into consideration in making his allocations of moneys. Nor do we attach any peculiar significance to the fact that the University lands are not again mentioned in the second clause. Section 7 continues with the following language:

"* * *the amounts to be fixed by the State Superintendent based upon existing facts and circum-

This language, we believe, precludes an interpretation that those school districts containing University lands or National forests should be removed from the application of the other provisions of the Act.

The concluding clause of Section 7 reads: "And in all exceptions provided herein the consent of the State Board of Education shall be first had and obtained." It is not without significance that this clause did not appear in the prior act passed five months earlier, but was added for the first time in House Bill No. 133. This fact, we think, indicates an intention on the part of the Legislature to remove any possible doubt as to the application to Section 7 of the general intent, expressed repeatedly throughout other sections of the Act, that the administration of this State aid fund shall be under the supervisory and discretionary direction of the State Board of Education. It is so stated, in Section 1 of the prior Act (S.B. No.185, Regular Session of the Forty-fifth Legislature, 1937): "* * *to be allotted and expended by the State Superintendent under the direction of the State Board of Education." The authority thereby granted is limited only by express provisions of the Act, and we do not believe that the language of Section 7 can be construed so as to remove from the administration of the funds by the State Superintendent and the Board of Education, those school districts which have either National forests or University lands within their boundaries.

"The Legislature alone is to judge what means are necessary and appropriate for a purpose which the Constitution makes legitimate. The legislative determination of the methods, restrictions, and regulations is final, except when so arbitrary as to be violative of the constitutional rights of the citizen." Cureton, J., Mumme vs. Marrs, S. Ct. of Texas, 1931, 40 S.W. (2d) 31, at page 36.

It is our opinion that Section 7 of H. B. No. 133 authorizes the State Superintendent to take into consideration the presence of University lands and National forests within a school district as one of the factors in determining the need of that district, but that such district must meet all the requirements set out in other sections of the Act in order to qualify for State aid. The fact that a district comes within the purview of Section 7 does not grant it immunity from the remaining provisions of the Act. Subject to the above limitations, the weight to be attached to the presence of University lands or National forests within a district is left to the discretion of the State Superintendent under the supervision of the State Board of Equalization.

Yours very truly

ATTORNEY GENERAL OF TEXAS


By

Walter R. Koch
Assistant


By

Glenn R. Lewis
Assistant

WRK:FG

This opinion has been considered in conference, approved, and ordered recorded.

GERALD C. MANN
ATTORNEY GENERAL OF TEXAS